DETROIT STEEL COOPERAGE CO. v. SISTERSVILLE BREWING CO. et al.

(Circuit Court of Appeals, Fourth Circuit. April 9, 1912.)

No. 1,081.

1. FIXTURES (§ 7*)—TANKS.

Steel tanks installed in a brewery constitute fixtures where they are essential to operation of the plant, are eight feet in diameter, more than twelve feet high, possess sufficient gravity to hold themselves in place

_____

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

without fastenings, and are removable from the building ónly on partial removal of a brick wall.

[Ed. Note.—For other cases, see Fixtures, Cent. Dig. §§ 7–13; Dec. Dig. § 7.*

For other definitions, see Words and Phrases, vol. 3, pp. 2831–2846; vol. 8, p. 7664.]

2. FIXTURES (§ 20*)—CONDITIONAL SALES—RIGHT OF SELLER.

Reservation of title by the seller of steel tanks which became fixtures in the buyer's brewery as security for the purchase money does not entitle the seller to retake the tanks or have a preference over the lien of bondholders for the unpaid balance of the price and distribution of the proceeds of a sale of the brewery, where the deed of trust securing the bonds, not only covered the real estate as it existed when the deed of trust was executed, but also provided that after-acquired property should be subject to the lien.

[Ed. Note.—For other cases, see Fixtures, Cent. Dig. §§ 44–46; Dec. Dig. § 20.*]

Appeal from the Circuit Court of the United States for the Northern District of West Virginia, at Wheeling.

Bill by the Detroit Steel Cooperage Company against the Sistersville Brewing Company and others. Decree dismissing the bill, and complainant appeals. Affirmed.

This is a bill in equity filed by the Detroit Steel Cooperage Company against the Sistersville Brewing Company and others in the Circuit Court of the United States for the Northern District of West Virginia, in which the complainant seeks to be declared the owner and entitled to take possession of 13 chip tanks located in the brewery of the Sistersville Brewing Company, at Sistersville, W. Va., or to be decreed to have a preference in the distribution of the assets of the said Brewing Company for $4,531.15, with interest, the unpaid purchase money for the said tanks. Upon the bill, exhibits, answer, and replication the case was heard on the 17th day of October, 1911, and a decree entered by the Circuit Court dismissing the bill for want of equity and adjudging costs in favor of the defendants. From this decree the complainant appealed to this court. The facts are in substance as follows:

The Sistersville Brewing Company, one of the appellees, was organized in 1904 under an act of incorporation passed by the Legislature of West Virginia. The business of the company was the manufacture and sale of porter, ale, and lager beer, and the principal office and manufacturing plant of the company were located at Sistersville, W. Va. The company owned a small parcel of land on which was erected the building used as its manufacturing plant, and in which building were the fixtures, machinery, and appliances necessary to the purposes of the establishment. In December, 1906, the company, under a provision of its charter, set about to make an issue of bonds, 80 in number, of the par value of $500 each (making an aggregate of $40,000), and, to secure the payment of these bonds with interest as it accrued, what is called a deed of trust in the nature of a mortgage was executed by the company to one Sells as trustee, in which deed the company conveyed the tract or parcel of land mentioned before with the brewery and buildings, machinery, and appliances thereon erected, or to be erected thereon, with appurtenances thereto belonging, or in any way appertaining, as well as the corporate rights and privileges of said company for use, benefit, and security as contemplated by the deed. This deed was duly recorded in Tyler county, W. Va., being the county in which the land and brewery thereon were located, on the 21st day of February, 1907. The funds derived from the sale of the bonds were used in the construction and equipment of the brewery plant. The bonds provided for, and for the payment of which the deed of trust above referred to was security, were all issued and were outstanding at the time

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of the transaction hereinafter set out between the Detroit Steel Cooperage Company and the Brewing Company.

On the 8th of August, 1908, a contract was entered into between the Brewing Company and the Detroit Steel Cooperage Company, whereby the latter-named company agreed to furnish to the former and place in the brewery 13 chip casks or tanks. The terms of the contract (after giving specifications as to number, description, manner of construction, character of workmanship, fittings, and fixtures with each tank, period within which delivery was to be made, etc.) were these:

### "Conditions.

"It being expressly agreed and understood that the title and ownership of all the tanks and fixtures covered by this proposal shall remain in us until all the payments as herein specified and any notes and acceptances that may be given on account of any such payments, shall have been fully paid; and, in case of default in any of said payments, notes, or acceptances, we shall have the right at our option to take possession of and remove said tanks and fixtures.

### "Delivery.

"We agree to furnish all of the 13 tanks, together with all fixtures and fittings as herein specified, f. o. b. cars at Sistersville, W. Va., on or before the —— day of ——, 190—, provided we are not delayed by accidents, strikes, riots, delays of carriers, or other causes beyond our control.

### "Erection.

"We will furnish the necessary labor and tools to erect in your brewery all of the herein specified tanks and connect the fittings and fixtures thereto in a first class and complete manner; also to test all of the tanks and make them perfectly tight under such pressure as before specified, but you are to furnish the necessary water or air for testing said tanks whenever it may be needed by our erecting engineer.

### "Openings.

"You are to provide all necessary openings in walls and buildings, to readily admit the tanks, finished and completed at our factory, so that they may be installed in their respective places and positions without being taken apart.

### "Price.

"The price of all the 13 tanks, together with the fittings and fixtures thereto, delivered and erected as hereinbefore specified, is the sum of five thousand four hundred eighty dollars ($5,480.00).

### "Terms.

"The payments of the above purchase price to be made as follows: $2,000.00 when all of the tanks have been shipped. $740.00 when erected at brewery and tested. $2,740.00 in the form of a promissory note, payable in three months from date with 6 per cent. interest per annum."

The tanks were made of steel, lined with glass enamel, were about 8 feet in diameter, 12 feet 10 inches high, and had a holding capacity of about 4,000 gallons each. Their gravity was sufficient to hold them in place without fastenings.

In accordance with the terms of this agreement, the Cooperage Company furnished the tanks, which were necessary for the purposes of the brewery, shipped them to Sistersville, and they were put in place in the brewery, and attached to and became a part of the operating machinery of the same. The cash payments were made, and notes given for the balance as set out in the contract. This contract was duly registered in Tyler county as required under the statute laws of West Virginia in January, 1909. After the tanks were delivered and put in place, as stated, in the brewery, George W. Hartman, Bollinger Bros., and others in April, 1909, filed a bill in the Circuit Court of the United States for the Northern District of West Virginia against the Sis-

tersville Brewing Company and others, alleging that complainants were the holders of a majority of the bonds issued by the said company; that default had been made in payment, and other acts had been committed by the company which warranted the proceeding to foreclose the deed of trust which had been executed as security for the payment of the bonds. In this case a decree was made appointing a receiver, and the property of the Brewing Company, including the tanks which were therein as a part of the equipment and machinery, was sold, and the proceeds are now in the hands of the receiver.

Charles N. Kimball and George M. Hoffheimer (Orla B. Taylor and Walter S. Sugden, on the briefs), for appellant.

Thomas P. Jacobs (Arlen G. Swiger, on the brief), for appellee.

Before PRITCHARD, Circuit Judge, and BOYD and ROSE, District Judges.

BOYD, District Judge (after stating the facts as above). [1] There are two questions presented by the record which become necessary for us to determine. The first is whether the tanks referred to are fixtures; and the second, if they are held to be fixtures, does the reservation of title in the contract between the Cooperage Company and the Brewing Company as security for the purchase money entitle the vendor to retake the tanks or to have a preference over the lien of the bondholders for the unpaid balance of the purchase price in the distribution of the proceeds of the sale of the brewery?

Considering the first question, we are readily of the opinion that the tanks were fixtures. They were adapted to the purposes of the freehold, were essential to the successful operation of the brewery, and were placed within the structure with the intention of making them a part of the operating machinery of the plant. The physical annexation of the tanks to the plant was complete, for they were put in place in the brewery and attached to the other machinery used in the production of malt liquors. They were carried to the proper position in the building through an opening in the wall, which had been left for that purpose, and which opening was closed up with brick and mortar, and it appears that, in order to remove them from the building, it would be necessary to tear this filling away. As will be seen, the tanks were made of steel, lined with glass enamel, were about 8 feet in diameter, 12 feet 10 inches high, and had a holding capacity of about 4,000 gallons each. Their gravity was sufficient to hold them in place without fastenings.

We think that by the well-settled principles of the law of fixtures in this country these tanks became, and were, a part of the realty. Undoubtedly under the law of the state of West Virginia as laid down by the Court of Appeals of that state in Patton v. Moore, 16 W. Va. 428, 37 Am. Rep. 789, the tanks were fixtures, for the court says in that case:

"The true rule in determining what are fixtures in a manufacturing establishment, where the land and buildings are owned by the manufacturer, is that where the machinery is permanent in its character, and essential to the purposes for which the building is occupied, it must be regarded as realty and passes with the building; and whatever is essential to the purposes for which the building is used will be considered as a fixture, although the connection between them be such that it may be severed without physical or lasting injury to either,"

However, we will not discuss this proposition further, nor do we deem it necessary to cite authorities in support of our view because it seems to us too clear for argument. This question disposed of, we come to the second.

[2] The deed of trust for the security of the bonds, not only covered the real estate as it existed at the time of the execution of the deed, but provided, as will be seen from the statement of facts, that after-acquired property was also subject to the lien. The Cooperage Company entered into the transaction with the Brewing Company for the sale to the latter of the chip tanks, as we gather from the record, with both actual and constructive notice of the existence of the deed of trust, and with this knowledge furnished the tanks, and permitted them to become a part of the freehold. The money derived from the sale of the bonds was used, as appears, in the construction and equipment of the brewery. The principle involved here is discussed at length in the case of Tippett & Wood v. Barham, decided by this court, and to be found in 180 Fed. 76, 103 C. C. A. 430. The court said in that case:

"There is a line of cases which, with more or less unanimity, holds that where a mortgage exists on real estate, and an accession is subsequently made of property agreed between vendor and the mortgagor to be treated as personalty and a reservation of title until paid for agreed upon between vendor and mortgagor purchaser, such accession, if it can be severed from the realty without injury to the latter or to the value of the security for the mortgage debt as it stood before the improvement was made, will be impressed with the same character as between the vendor and mortgagee as between the vendor and mortgagor; in other words, that it does not become real estate, and may be removed without invading the rights of the mortgagee. * * *

"Upon the other hand, there are many cases (some of which will hereinafter be referred to) which hold that personal property incorporated into or affixed to real estate in such manner that it would be subject to the lien of an existing mortgage thereon as between the mortgagor and mortgagee will be so subject to the lien of the mortgage, notwithstanding the existence of an agreement between the vendor and the mortgagor that it shall retain its character as personal property, unless the mortgagee be also a party to such agreement. This is what is generally known as the 'Massachusetts rule,' and it has been affirmed by many other courts of last resort, and particularly by the Supreme Court of the United States in several cases hereinafter separately referred to.

"We think this latter doctrine announces the correct principle, especially where the application is, as in the present case, confined to a case wherein the mortgage (containing an after-acquired property clause) has been drawn for the purpose of embracing the entire working plant of the corporation, including its franchises, as in such cases it is usually true that the mortgage is given at a time when the real estate is but very insufficient security for the debt, and the subsequent accessions are very generally made by the expenditure of the funds derived by reason of the negotiation of the bonds secured by such a mortgage, and the mortgage is made and received in contemplation of such accessions. In such cases the equities of the beneficiaries under the mortgage should and must attach to such accessions as, under the description contained in the mortgage, are included within it, unless some higher equity or a legal title intervenes."

In view of our conclusion upon the first question, we think this case decisive of the second, and the decree of the Circuit Court is therefore affirmed.

Affirmed.